**TEXAS & N. O. RY. CO. v. WAGNER et al.**
**(No. 8406.)**

(Court of Civil Appeals of Texas. Galveston. Dec. 14, 1923. Dissenting Opinion Jan. 10, 1924. Rehearing Denied March 6, 1924. Dissenting Opinion March 13, 1924.)

**1. Railroads ☞348(6)—Evidence held insufficient to sustain verdict on question of discovered peril.**

In action for death of automobile occupant at crossing, evidence *held* insufficient to sustain finding for plaintiffs on question of discovered peril.

**2. Railroads ☞320—Trainman held entitled to assume automobile driver would not drive on track.**

Locomotive fireman on train approaching crossing who knew that view of occupants of automobile slowly approaching crossing was unobstructed had a right to assume that they were looking and listening for approaching train, and did not intend to drive upon track.

**3. Railroads ☞348(8)—Finding automobile driver not negligent held against evidence.**

In *action for death* of automobile occupant struck by train at crossing, finding that driver was not contributorily negligent in driving on track with unobstructed view of approaching train at speed of from four to five miles per hour *held* against the great weight and preponderance of the evidence.

**4. Appeal and error ☞1012(1)—Judgment based on finding contrary to overwhelming weight of evidence should be reversed.**

Judgment based on a finding which is in the opinion of the appellate court contrary to the overwhelming weight of the evidence should be reversed.

**5. Trial ☞350(1)—Defendant entitled to have defenses affirmatively submitted on submission of cause on special issues.**

Where a cause is submitted to a jury on special issues, the defendant is entitled to have all his defenses affirmatively submitted on proper request therefor.

On Petition for Rehearing.

**6. Appeal and error ☞882(3)—Plaintiff not entitled to sustain judgment on theory other than that on which case was tried.**

In action for death of automobile occupant struck by train at crossing, plaintiffs having tried case on theory that the locomotive fireman discovered the peril of the occupants of the automobile and could have stopped train in time to avoid accident, and having acquiesced in submission of such issue to jury, were not entitled to have judgment sustained on appeal

on theory that the conductor discovered the peril.

Graves, J., dissenting.

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Suit by Mrs. Mamie Wagner and others against the Texas & New Orleans Railway Company. Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

See, also, 224 S. W. 377.

Baker, Botts, Parker & Garwood and Garrison & Watson, all of Houston, for. appellant.

Louis, Campbell & Nicholson, of Houston, and Thompson, Knight, Baker & Harris and Carden, Starling, Carden, Hemphill & Wallace, all of Dallas, for appellees.

LANE, J. This suit was brought by Mrs. Mamie Wagner, the widow, and Mrs. O. D. Kirkpatrick, the mother, of F. G. Wagner, deceased, to recover damages sustained by them on account of the killing of the said F. G. Wagner at Gregg street crossing in the city of Houston, in a collision between an automobile in which he was riding and a passenger train of the defendant.

Plaintiffs alleged that Wagner's death was the result of the negligence of the defendant, its agents and servants, in operating its train, (1) in not keeping a proper lookout for persons about to cross its railway track at Gregg street; (2) in not giving a proper signal of the approach of its train; (3) in operating said train at an excessive and dangerous rate of speed, and at a rate of speed in excess of the speed prescribed by the ordinances of the city of Houston; (4) in failing to sound the whistle of its engine 80 rods from the crossing, and in failing to keep the engine bell ringing from the time said engine reached a point 80 rods from said crossing until said crossing was passed; and (5) in failing to keep a watchman at said crossing, or to install and maintain gates and automatic bells or other signals to warn persons about to cross its track of the approach of its trains. They further alleged that the fireman on the engine discovered the perilous position of the deceased on the approach of the train in time that by the exercise of ordinary care he could have warned the engineer in charge of the engine in time for the latter, by the use of the means at his command, to have stopped or slackened the speed of the train and have avoided injuring deceased, but that said fireman failed to give the engineer such warning, and that such failure was negligence on the part of said fireman.

The Western Indemnity Company, an insurance corporation, joined as plaintiff in the suit, and alleged that as a result of the death of Wagner it had to pay to his benefi-

ciaries certain sums of money, and was obligated to make further payments in the future, and prayed that it be subrogated to the extent of such sums as it had paid or was obligated to pay by a certain judgment rendered against it in favor of said beneficiaries, the same to be paid out of any judgment which might be rendered against defendant in favor of said beneficiaries. But as there is no controversy presented between said indemnity company and either of the other parties, no further mention of it will be made.

The defendant pleaded a general denial and contributory negligence of the deceased and Gordon O. Davis, who was driving the automobile at the request of the deceased at the time 'of the accident, in that said parties approached the railway at the point of the accident and undertook to cross the same without taking any precaution to ascertain whether or not a train was approaching; that on approaching said railway they neither looked nor listened for the approach of a train; that the whistle of the engine was sounded, and the bell rung, as required by law, and that, had said parties looked and listened, they could have seen the approaching train for a great distance 'from the point of the accident, and could have stopped as they should have done, and had they done so they would have prevented the collision.

In answer to special issues submitted to the jury they found:

(1) That the train which collided with the automobile in which the deceased was riding was running at a rate of speed, as it approached the point of the accident, exceeding that prescribed by the ordinances of the city of Houston.

(2) That the operators of the engine were guilty of negligence in failing to give additional warnings or signals, by the blowing of the whistle, of the approach of the engine to Gregg street, then were given, and that such negligence was the proximate cause of Wagner's death.

(3) That neither of the occupants of the automobile failed to use ordinary care to look for the approaching train or to listen for the approaching train, nor were either of the occupants of the automobile guilty of negligence in not stopping the automobile and in going upon the railroad track at the time and under the circumstances they did.

(4) That the fireman discovered and realized the perilous position of the deceased in time to have notified the engineer so that the said engineer in the exercise of ordinary care could have stopped or slackened the speed of the train and have prevented the accident.

(5) That the plaintiff Mrs. Wagner sustained pecuniary damages in the sum of $30,-000, and that the plaintiff Mrs. Kirkpatrick sustained damages in the sum of $1,500.

Judgment was rendered and entered against the defendant Texas & New Orleans Railway Company in accordance with the findings of the jury, and from such judgment said company has appealed.

This is the second appeal of this cause. Upon the first trial the question of discovered peril was not in the case, but judgment was rendered against the defendant in favor of the plaintiff Mrs. Wagner for $15,000 and for the plaintiff Mrs. Kirkpatrick for $500, upon the findings of the jury that the deceased met his death as the proximate result of the negligence of the defendant, and that the deceased was not guilty of contributory negligence pleaded by defendant. On appeal from such judgment this court reversed the same upon the grounds that the findings of the jury that the deceased was not guilty of contributory negligence as pleaded by the defendant was so against the great weight and preponderance of the evidence as to be clearly wrong, and for such reason the cause was remanded for retrial. See T. & N. O. R. R. Co. v. Wagner (Tex. Civ. App.) 224 S. W. 377.

On the last trial the evidence relative to contributory negligence was the same as upon the former trial. The evidence of the several witnesses at the first trial with reference to contributory negligence was read to the jury, and no new evidence other than a few minor and immaterial corrections of the testimony of the engineer, Williams, was offered. Whatever of new evidence was offered was upon the issue of discovered peril, which was not submitted at the first trial.

We shall not undertake to discuss in detail all of the 75 assignments of error presented by appellant, but shall confine our discussion and decision to those issues only which we think control the disposition of this appeal.

Appellant contends that there was no evidence to support the finding of the jury that the fireman on the engine which collided with the automobile of the deceased discovered and realized that the deceased was in a 'perilous situation in time to have notified the engineer in charge of the engine so that said engineer, in the exercise of ordinary care, could have stopped or slackened the speed of the train and have prevented the accident, but that, if it be mistaken in asserting that there was no evidence to support such finding, then he says that such finding is so against the great weight and preponderance of the evidence that it should not be permitted to stand.

[1] The majority of this court have reached the conclusion that appellant's alternative contention should be sustained. The evidence relative to the question of discovered peril shows that the deceased was traveling in a Ford automobile at the time of his death; that one Gordon O. Davis was driving said automobile at the time of the collision at the request of the deceased; that deceased and Davis had, only a few minutes

before the collision, crossed the railway track at the point of the collision going south to Orlando's store, situated on the east side of Gregg street, Houston, and fronting west on said street, and about 175 feet south of the point where the railway track crosses Gregg street, the point of the collision. The deceased and Davis left Orlando's store and drove north, approaching said railway at a rate of speed of 4 or 5 miles per hour. The automobile in which they were riding when moving at said rate of speed could have been brought to a standstill within 6 or 8 feet. Parties in an automobile at a distance of 15 feet or less from the railway track on Gregg street could, by looking, see a train approaching from the east a mile or more, and the fireman on a locomotive approaching from the east could see said automobile in the situation named for a half mile or more.

It is not contended that there was evidence to support a finding that the engineer saw the automobile or its occupants in time to have stopped his train or to have slackened its speed so as to have prevented the collision; indeed, the question as to whether the engineer saw said automobile or its occupants was not submitted to the jury. The only question submitted to the jury in an attempt to show discovered peril was as to whether the fireman discovered the deceased in a perilous situation in time to have warned the engineer of such peril so that said engineer could, by the means at hand, have stopped the train or so slackened the speed of the train as to prevent the collision.

The train which collided with the automobile was approaching the point of collision from the east. The witness Stratton testified that he was standing about one-half block from the point of collision; that he saw the train that day about 3 blocks down the track; that the whistle first attracted his attention to the approaching train; that the train was about 3 blocks down the track when the whistle blew; that he did not hear the ringing of the bell, as he was not paying any particular attention to the ringing of the bell; that he could hear the noise of the approaching train outside of the whistle; that the entire train passed over Gregg street and the last coach stopped between Gregg street and the next street to the west; that the whistle was blown twice before reaching Gregg street; that the train was running about 20 miles per hour; that he saw deceased and Davis when they left Orlando's store, and saw them slowly approach the point of the collision.

The witness Weber testified that he was about a block and a half east from the Gregg street crossing, and saw the approaching train; that the whistle was blown about opposite him.

John Stevens testified that he heard the whistle blown; that at that time the train was about a block or a block and a half from Gregg street.

Susie Spiller testified that she was in her back yard and heard the train whistle, and then thereafter she heard it sounded twice before it reached Gregg street.

Alberta Gross testified that she heard the whistle sounded between Gregg street and Cage street, the first street east of Gregg street, and that she also heard the bell ringing; that the bell was ringing about the time it reached Gregg street.

The undisputed evidence shows that the emergency brake was applied and that the train stopped between Gregg street and first street to the west thereof.

E. N. Williams, the engineer, testified that his engine was a compound Atlantic type engine; that at the time of the accident everything about his engine was in first-class condition; and that as he approached Gregg street he was running about 18 to 20 miles an hour; that his place on the engine was on the right side of the cab; that the automobile in which deceased was riding approached the crossing from the left side of his engine, and that he did not see it before the collision; that Mr. Trahan was the fireman on the engine; that he is now dead; that when his engine was about 40 or 50 feet from the crossing the fireman called to him to "Look out!" that he then immediately applied the air; that after he applied the air his engine ran about 75 to 90 feet; that there was nothing to prevent the fireman from seeing an automobile 75 feet south of the railway track where it crosses Gregg street; that he could see an automobile 150 feet from the track, and that those in the automobile could see the approaching train when that distance from the track.

Testifying further, he said that to the best of his judgment he was only 50 or 75 feet from the crossing when the fireman called to him to "Look out!" that when such warning was given he immediately applied the emergency brake, and did everything in his power, consistent with the safety of the train and passengers, to stop the same; that it was impossible to have stopped that train any sooner than it was stopped; that it takes an engineer some time to comprehend the warning; that he must get the information from the fireman, then he must concentrate his mind on what to do, and after so doing he must apply the air; that all these things take time; that he did not stop to observe the distance he was from the crossing, but that he applied the air and stopped as quickly as he could—he had no time to consider the distance; that the first he saw of the automobile was when it was coming over the track; that he struck the right rear wheel of the automobile, and if it had gotten one foot further it would not have been struck; that to apply the air all he had to do was to throw the lever that controls the emergency; that he could throw the lever by a quick movement of his hands, and this would immedi-

ately apply the air brakes on the entire train; that by the time he was able to throw the lever his engine was about 15 or 20 feet from the crossing; that in his best judgment he was running at a rate of speed of 18 to 20 miles at the time the warning was given by the fireman; that the fireman told him that when he realized that deceased was going on the track he called "Look out!" and that when the fireman said "Look out!" he at once applied the air.

A. Middleton, a locomotive engineer, testified that he had testified as an expert witness in a great many cases; that he gets different prices for his testimony; that the average price is $10 per day and expenses. Testifying further, he stated that in order to stop the train the engineer applies the brakes—the air; that he supposed it takes less than a second to throw the lever working the brakes, and when the lever is pushed around the brakes snap "immediately, like snapping your finger"; that the engineer turns on the air and the sand at the same time, one with one hand and the other with the other hand; that they are right there in front of him; that the sand is blown out with the air, and acts quickly; that it goes down in front of the drive wheels; that to stop a train in an emergency the steam should also be shut off; that a passenger train consisting of four coaches, such as the one in question, running at six miles an hour, could be stopped with safety to the train and its passengers within 5 to 10 feet, at 15 miles an hour, within 40 to 50 feet, at 15 to 20 miles an hour, within 60 or 75 feet; that where an engineer's attention must be called to something by the fireman which would require an emergency stop the mind of the fireman has got to take in the situation, and then he has got to impart his information to the engineer, then the engineer's mind has got to act, then he begins to work the valves; that, however, would not take much time; that when an engineer has knowledge that an object is in front of him the first thing he should do is to stop, but if he cannot stop it would be best to blow the whistle and ring the bell; the engineer must take into consideration the best thing to do to prevent the accident; that the mind works awful fast in cases of emergency, and but little time for the working of the mind would be required.

J. W. O'Brien, another expert witness, testified that a passenger train of four coaches, pulled by an Atlantic compound two-drive engine, with air brakes all in good condition, on level track, with rails dry, everything in good working condition, when running at 18 to 20 miles an hour, could be stopped within 60 to 65 feet.

The foregoing statement, we think, embraces all the evidence even remotely relative to the issue of discovered peril, and, as we have already said, the majority of this court

thinks that the finding of the jury that the fireman discovered the deceased in a perilous situation and realized such peril in time to have warned the engineer in time so that the engineer could have stopped or slackened the speed of the train by the use of the means at his command, and thereby have prevented the accident, is so against the great weight and preponderance of the evidence as a whole that it should not be permitted to stand as a basis for depriving appellant of its property.

That the fireman saw the automobile slowly moving toward the railway track at a time when the engine was several hundred yards east of Gregg street, and the point of collision, may be conceded, but such concession would by no means be a concession that he discovered and realized that the deceased was in a perilous situation. That the deceased was not in actual danger of being struck by the locomotive until he drove upon the railway track in front of the approaching train is manifest. Discovered peril, as that term is used in the law, means more than a discovery that one is in a position where he might unreasonably throw himself in peril. It means a discovery of one in a situation of actual danger or peril, from which it is made reasonably to appear to a person of ordinary intelligence that he either could not or would not extricate himself, or that he was in a situation such as would reasonably raise an apprehension in the mind of a person of ordinary intelligence, in the exercise of ordinary care, that he would place himself in peril.

It has been held by our courts that, when the operatives of railway locomotives see a child of tender years, or one known to such operatives to be wanting in discretion, or one doing some act which would reasonably indicate that he intended to place himself upon the track, approaching the railway track in front of their approaching locomotive, such operatives should not speculate upon the probabilities as to whether such child or person would or would not go upon the track in front of their locomotive, but they should reasonably anticipate that such persons might place themselves in a position of danger and be injured unless said operatives used ordinary care to use the means at their command to prevent such injury; but we know of no case in which it has been held that such operatives could or should reasonably anticipate that an automobile approaching a railway track at 4 or 5 miles per hour, driven by persons possessed of ordinary intelligence, would go upon the railway track in front of an approaching passenger train in plain view, which was at the time only 50 to 75 feet distant, unless they were doing some act, other than slowly approaching the track, which would reasonably indicate that they intended to go upon the track, and we think that it should never be so held. It seems to us that

the natural and reasonable conclusion under such circumstances would be that such persons were intending to and would bring their automobile to a stop before entering upon the railway track, and not that they would do the unreasonable thing of endangering their lives by driving upon the track in front of such approaching train. It seems to us that the slow approach of the automobile to the railway track at the point where the approaching train was in full view and close at hand would have reasonably induced and did induce the operatives of the locomotive to conclude that the driver of such automobile would stop it before it reached such railway track.

It is, we think, within the knowledge of all men of common observation and experience that innumerable drivers of automobiles, when, approaching a railway track, they see the near approach of a moving train, will move slowly toward said track to await the passing of such train. It would be an intolerable and unreasonable rule to require operatives of trains to stop such trains every time they saw an automobile approaching the railway track at a rate of four or five miles an hour. We cannot get our consent to subscribe to such a rule, unless compelled to do so by some superior authority. The courts should not be used as a vehicle to transfer the property of any person, natural or artificial, to another under the facts of this case relating to discovered peril, no matter how able the former is to respond, nor how needy the latter.

In support of the conclusions reached by the majority of this court we cite and quote from Pillow v. Texarkana & F. S. Ry. Co., 55 Tex. Civ. App. 597, 119 S. W. 128; S. A. & A. P. Ry Co. v. McMillan, 100 Tex. 562, 102 S. W. 103; H. & T. C. Ry. Co. v O'Donnell, 99 Tex. 636, 92 S. W 409; and Schaff v. Gooch (Tex. Civ. App.) 218 S. W. 783.

In Schaff v Gooch, supra, in which it is held that the burden of proof rests upon the plaintiff to prove the issue of discovered peril, the court said:

"The rule of law is well settled in this state that in order for a recovery to be had under the doctrine of discovered peril, which eliminates the defense of contributory negligence, it must be made to appear that the injured party was in a position of imminent danger, and that the defendant or those acting for him, discovered the dangerous situation of the injured party in time to have averted the injury by the exercise of proper care. Texas & Pac. Ry. Co. v. Breadow, 90 Tex. 26, 36 S. W. 410; Morgan & Bros. v. M., K. & T. Ry. Co., 108 Tex. 331, 193 S. W. 134; Galveston Electric Co. v. Swank, 188 S. W. 705."

In S. A. & A. P. Ry. Co. v. McMillan:

"In applying the doctrine of discovered peril the railroad company cannot be held liable because the servant was negligent in failing to discover the person or in failing to recognize his peril, but it must appear from the evidence that the servant actually saw the man, realized his peril and that he would not get off the track. Railway Co. v. Breadow, 90 Texas, 26, 36 S. W. 410, above cited. It must also appear that the discovery of the peril was in time for the trainmen by the use of the means at hand to stop the train before coming in collision with the men."

In Pillow v. Ry. Co., supra:

"The rule is well settled that, in the absence of actual discovery and the appreciation of the peril, the rule of discovered peril has no application. Railway Co. v. Kelleher (Tex. Civ. App.) 107 S. W. 64."

Again:

"Assuming that the employés did see appellant when he flagged the train, he was not then in a position of peril. They had a right to assume that he would get out of danger before the train reached him."

In H. & T. C. Ry. Co. v. O'Donnell, supra:

"The enginemen being ignorant of O'Donnell's deafness, were charged with no duty which would arise from the existence of that infirmity; but they had the right to treat him as a person in full possession of his senses, and, seeing him near the track, might presume that he would make proper use of his faculties, and would get far enough away from the track to insure his own safety. They were not required to anticipate that he would be guilty of an act of negligence, either by remaining in danger, if he was so or by putting himself in danger. If O'Donnell was negligent to render the railroad company liable, the evidence must show that O'Donnell was in a place of danger when seen by the employés, that the men in charge of the engine saw him and realized that he was in a dangerous position, and also that he either could not or would not probably extricate himself from the dangerous situation."

In Fort Worth & D. C. Ry. Co. v. Shetter, 94 Tex. 196, 59 S. W. 533, Judge Williams, in speaking for our Supreme Court with reference to discovered peril, said:

"But it must be borne in mind that upon this issue the question is, Was it known to the brakeman before plaintiff went upon the track, not simply that he desired to cross it, but that he would do so where his act would be negligent and expose him to danger? In other words the brakeman must have known that plaintiff was in danger because he was about to do a negligent and dangerous act. We think it well settled that one person is not bound to anticipate negligent conduct on the part of another, and therefore that a jury would not be justified in finding that the brakeman, before he saw plaintiff actually in danger, knew that he was negligently going into danger."

Again:

"Certainly it is at least equally true that trainmen are not bound to assume that a person not on the track will get on it, where it would be negligent and dangerous for him to do so, and, as they would not be bound to assume it, a jury could not properly find that they

knew it would be done in the absence of proof of knowledge."

Even if the fireman saw the deceased, in the present case, moving slowly towards the track as the train approached the crossing, he had the right to assume that deceased would stop at a place of safety and not go upon the track. He certainly was not required to anticipate that deceased would be guilty of an act of negligence by putting himself in danger.

In appellees' brief the cases of Galveston Electric Co. v. Antonini (Tex. Civ. App.) 152 S. W. 845, St. Louis S. W. Ry. Co. v. Ford (Tex. Civ. App.) 237 S. W. 656, and Hines v. Arrant (Tex. Civ. App.) 225 S. W. 770, are cited as supporting their contention that the fact that the fireman saw the automobile in which the deceased was riding moving slowly toward the railway track was of itself sufficient to require him to anticipate that the automobile would probably be driven upon the track in front of the approaching train.

[2] We do not think the decisions cited are authorities for any such contention. The effect of the holding in all these cases is that, if the manner in which one approaches a railway track is such as would reasonably indicate to the operatives of the train that he intended to go upon the track in front of the train, it is the duty of said operatives to use ordinary care to use all the means at hand to prevent injuring such person. In the present case, however, it is shown by the undisputed evidence that the fireman knew that the view of the occupants of the automobile was unobstructed, and that if they were looking and listening for the approaching train, as he had a right to assume they were, they would see and hear said train, and he had a right to assume, in the absence of some act other than that they were moving slowly toward the train, that they did not intend to drive upon said track, but, to the contrary, that as reasonable human beings they would stop until the train had passed.

We think the decisions cited by us, some of which are by our Supreme Court, fully sustain the conclusions just expressed, and that the conclusions reached by us are sustained by common sense and by the weight of authority. For the reasons pointed out, we sustain the contention of appellant above discussed.

We next come to a consideration of appellant's contention that the finding of the jury that the deceased and his driver, Gordon O. Davis, were not guilty of contributory negligence is so against the great weight and preponderance of the evidence that it should not be permitted to stand as a basis for the judgment rendered. On a former appeal of this case we sustained a similar contention, and reversed the judgment and remanded the cause. 224 S. W. 377. At the last trial,

from which this appeal is prosecuted, the evidence adduced upon the former trial relative to contributory negligence was read to the jury under agreement of both parties, and no new evidence relative to that issue was offered. We shall therefore not set out the testimony in detail, but will here refer to said former opinion, as the testimony is there set out in full, with the exception of a few witnesses, whose testimony will be here stated.

Witness Stratton testified that he was standing about one-half block from the point of collision; that he saw the train as it approached, when it was about three blocks distant; that the whistle was sounded about the time he first discovered the approach of the train; that he was paying no attention to the ringing of the bell, and could not say whether it was ringing or not; that he could hear the noise of the train as it approached; that the whistle was blown twice before reaching the point of collision.

Witness Weber testified that he heard the whistle of the approaching train; that it was blown when about a block and a half from the point of collision.

John Stevens testified that the whistle was blown about a block or block and a half from the point of collision.

Susie Spiller testified that she was in her yard and heard the train approaching, heard the whistle blown, and that it was blown twice thereafter before it reached the point of collision.

Alberta Gross testified that she heard the whistle blown; that it was blown between Gregg and Cage streets, the first street east of Gregg street, and that she also heard the bell ringing; that the bell was ringing at the time it reached the point of collision.

E. N. Williams, the engineer in charge of the engine propelling the train, testified that the whistle was blown at all street crossings intervening between Englewood yards, a point more than a mile east of the point of collision, and the point of collision, and the bell was rung continuously from the time they left said Englewood yards until the point of collision was reached.

The undisputed evidence shows that a person approaching the railway track from the south where it crosses Gregg street could see a train approaching Gregg street from the east for more than a mile after such person had gotten within 50 feet of said track; that there was nothing that could have obstructed the view of such person.

We do not think any of the testimony above stated is contradicted directly or by any circumstance.

The undisputed evidence of Gordon O. Davis, the driver of the automobile in which the deceased was riding at the time of the collision, shows that they had, just before the accident, crossed the railway track at the point of the collision, and that they knew

where the track was; that they approached the track for about 175 feet at a rate of speed of 4 to 5 miles per hour. He testified, however, that when in about 12 to 15 feet of the crossing he looked both ways to see if he could see a train, and that he saw none; that he did not listen for an approaching train. See testimony of this witness set out in opinion, 224 S. W. 377. He testified that he could not explain why he did not see the approaching train, but that as a fact he did not see it.

[3] We feel constrained to support the contention that the finding of the jury complained of is so against the great weight and preponderance of the evidence that it should not be permitted to form the basis for the judgment rendered. Practically the only excuse or reason assigned by appellees as to why the occupants of the automobile did not see the approaching train is that when they looked for the train, when 12 to 15 feet from the track, they might have been looking into the solid body of an upright telephone pole on the right of way, or at a cattle guard which was perhaps not over 4 feet from the ground. These suggestions, however, were not raised by the testimony of the witness Davis, or any other witness, but only by counsel for appellees in their briefs. We do not think there is any merit in such suggestion. It can hardly be contended that the occupants of the automobile had exercised ordinary care for their own safety by looking for the approach of a train at the very instant they saw that a telephone pole obstructed their view, while in the very next instant such pole would not have so obstructed their view, if it had so done at any point.

In Railway Co. v. Edwards, 100 Tex. 22, 93 S. W. 106, our Supreme Court said:

"The law is well settled that a traveler approaching a railroad crossing must exercise ordinary prudence in going upon the track to see that he may do so with safety. He cannot excuse the absence of all care by showing that those in charge of a train have also been guilty of negligence."

To the same effect are the decisions in the following cases: Baker v. Collins (Tex. Civ. App.) 199 S. W. 519; Lancaster v. Foster, 260 Fed. 5, 171 C. C. A. 41; Southern Traction Co. v. Kirksey (Tex. Civ. App.) 181 S. W. 545; Ry. Co. v. Paine (Tex. Civ. App.) 188 S. W. 1033.

As said in Railway Co. v. Loeffler (Tex. Civ. App.) 59 S. W. 558:

"We fully recognize the importance of a strict observance by the courts of the rule that jurors are the exclusive judges of the credibility of witnesses and of the weight to be given to their testimony, but this rule neither requires nor contemplates that the mind and conscience of the court shall be entirely and unreservedly surrendered to the judgment of a jury upon all questions of fact that may arise in the trial of a case. When the verdict of a jury is so against the weight and preponderance of the evidence as to be clearly wrong, it is the duty of the court to set such verdict aside; and the grave responsibility thus placed upon the judiciary of determining whether or not the evidence in a particular case is legally [reasonably] sufficient to deprive a citizen of his property cannot be evaded."

In G., C. & S. F. Ry. Co. v. Gaddis (Tex. Com. App.) 208 S. W. 895, Judge McClendon, in discussing the duty of the appellate courts, said:

"We are met with the suggestion that a contrary opinion has been reached by twelve jurors, a trial judge, and three judges of the Court of Civil Appeals, from which it is urged that such conclusion must be reasonable. We are not unmindful of the force of this suggestion. However, the reasonableness of a conclusion to be drawn from undisputed facts is not be tested by the reasonableness of the individuals who arrive at it, but by the inherent soundness or reasonableness of the conclusion itself; and, when such question is presented to an appellate court for decision, such court must decide the question for itself, untrammeled by what other minds may have concluded, and with the consciousness that its own conclusion may not in every instance meet the full approval of others equally capable but not charged with the ultimate duty of decision. A different conclusion by other minds is, of course, persuasive. Which fact makes valuable the opinions of other jurisdictions not binding, as a matter of law, upon this jurisdiction. But in the last analysis each court is charged with the duty and must for itself determine the question of reasonableness of a particular conclusion from a given undisputed state of facts; and, with all deference to those with whom we here differ, we have been unable to reach any other reasonable conclusion but that contributory negligence as a matter of law is shown in this case."

[4] A judgment based upon a finding which is, in the opinion of the appellate court, contrary to the overwhelming weight of the evidence, should be by such court reversed. It is not only the right of but the duty of the court in such case to reverse the judgment. T. & N. O. Ry. Co. v. Wagner (Tex. Civ. App.) 224 S. W. 377; Ry. Co. v. Hart (Tex. Civ. App.) 178 S. W. 795; Ry. Co. v. Loeffler (Tex. Civ. App.) 59 S. W. 558; Hines v. Roan (Tex. Civ. App.) 230 S. W. at page 1082.

[5] By appellant's fourth proposition it is insisted that, where a cause is submitted to a jury on special issues, the defendant is entitled to have all his defenses affirmatively submitted when proper request is made therefor. The proposition states a correct abstract proposition of law (Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517); and, if this cause is again tried, the trial court should comply with the rule announced.

For the reasons pointed out, the majority of this court have reached the conclusion

that the judgment should be reversed, and the cause remanded, and it is accordingly so ordered; Associate Justice GRAVES dissenting.

Reversed and remanded.

GRAVES, J. (dissenting). This is the second appeal of this cause. In two orderly trials juries have awarded recoveries to the appellees, and the able and experienced trial judge has as often declined to interfere. This court, however, without in either instance holding that any error was committed in the receipt or rejection of evidence, or in the giving or refusal of charges, has vetoed and held for naught both verdicts, solely upon the weight of the testimony. Its plain duty in such circumstances, so often enjoined as to have become a fixed principle in our appellate procedure, is to give the evidence tending to support the verdict the benefit of every reasonable intendment, with a view that it shall stand—not to select some that may be unfavorable and indulge in possible deductions from that alone. It seems to me that by no other process can a reversal be ordered, in the state of the record now before us.

The evidence which I think puts the issue of discovered peril in the case was in all essential respects undisputed, while upon the whole that favorable to the jury's finding on the matter so strongly preponderated in its support as to leave this court powerless to set it aside. It will be only briefly reviewed. The engineer of appellant's train, testifying in person upon this trial, after being catechised on cross-examination as to conflicting statements he had made about the situation at the time the fireman called to him to "Look out!" finally put the matter this way just before leaving the witness stand:

"When the fireman said, 'Look out!' this man was on the south side of the main line coming toward the track, and he told me afterwards that from the way he was coming, the speed, that 'I knew he was going to get on the track and be struck, and I hollered at you to look out.' Then I immediately applied the air, and at that time I was 50 or 60 or 70 feet from the crossing, and running about 18 or 20 miles an hour. The man was about 30 feet from the track then; that is what the fireman told me afterwards; and following that I saw the man when he came on the track and got in the position I have just described. That is what I have described to you, and that is exactly the way it happened. * * * When I said that the automobile was 30 feet south of the track, I do not mean that I saw it there, but that is what the fireman told me."

Elsewhere he testified as follows:

"The fireman said something to me about it before the collision. He said 'Look out!' In my judgment I was some 50 or 75 feet from the crossing when the fireman hollered to me, 'Look out!' * * * My judgment is that we must have been 50 or 75 feet from the point we struck when I first threw the lever; that is my best judgment. It might be more or less. I had not seen the automobile at that time, I am positive that the first time I saw the automobile was when the rear wheels of the automobile were on the north rail, and at that time I was 50 or 75 feet from it. Something like that." "We struck the rear wheel of the automobile. If he had gotten over the track one foot further we would not have struck him. Just the corner of the pilot on my side of the engine struck the rear wheel of the automobile. If he had come 6 inches further he would have cleared." "Before the fireman made that remark to me, 'Look out!' he was looking ahead. * * * The fireman was a man named Trahorn. He sits on the left-hand side of the cab, which is the same side from which the automobile was approaching. He had a plain and unobstructed view of the right of way and the approach to the right of way. The fireman was on his side and I on my side, and we were both looking ahead, and each of us had an unobstructed view of our respective sides of the locomotive." "Everything about the engine was in first-class shape. Brakes were first-class. The track was dry. The sun was shining. I made the stop in, it may have been, less than 75 or 100 feet. I did not measure it." "In my deposition Mr. Garrison asked me the question, 'At the time you saw the automobile just before the collision, was he running slow or fast?' and I answered, 'He was running about 12 or 15 miles an hour;' and that is what I said a while ago—12 or 15 miles an hour.'"

Only two other witnesses testified about the speed of the automobile, Blake Stratton and the driver, G. O. Davis; Stratton saying that it started toward the track slowly, and that he did not again notice it till the accident happened, while Davis said:

"It is my best judgment that we were not exceeding four or five miles an hour from the time we left Orlando's store until we got struck; we run along at the same speed practically all the time; before either of us looked we were within 15 feet of the track."

The speed of the train at the same time was placed by its conductor, Mr. Younger, at 12 or 15 miles per hour, by its engineer, Mr. Williams, at 18 or 20 miles, and by the only remaining witnesses who ventured estimates, Blake Stratton and J. A. White, at about 20 miles and 35 or 40 miles, respectively. It is therefore apparent that the jury, who were neither asked to nor did they state any findings as to the speed of either the train or the automobile, were fully authorized to and may have made decidedly different ones from those appearing in the majority opinion, that is, 4 or 5 miles per hour for the automobile and 20 miles for the train. In illustration: They may have adopted the conductor's estimate of the speed of his train and the engineer's repeated one as to that of the automobile, about 12 to 15 miles per hour for each, thus making the rate of their movements approximately the same; or they may have determined the train was running 35 or 40 miles and the automobile 12 or 15.

An ordinance of the city of Houston prohibited the running of trains at that place in excess of 6 miles per hour.

D. A. Middleton, a disinterested engineer and fireman of 25 years' experience with appellant's railway system, after saying he had worked with and was familiar with the type of engine used in this instance, testified further as follows:

"It takes less than a second to apply the emergency stop, and the brakes snap on immediately, just like snapping your fingers. A train running 15 miles an hour can be stopped within 40 or 50 feet. A train running 15 or 20 miles an hour can be stopped in 60 or 75 feet."

J. W. O'Brien, another disinterested witness, and a locomotive engineer of 14 years' experience, testified to this effect:

"I have had experience with the type of engine involved in this accident ever since they came out. A train traveling 12 or 15 miles an hour could be stopped in 15 to 18 feet. The same train under the same conditions, running 18 or 20 miles an hour, could be stopped in 60 or 65 feet. The same train, operated under the same conditions, going 30 miles an hour, could be stopped between 125 and 140 feet."

Middleton also testified that when an engineer sees an object in front of him and cannot stop the best thing to do is to blow the whistle and ring the bell.

The distance from Orlando's store to the center of the north railroad track was 163 feet, and the weight of the testimony is that, not only was the engine bell not rung continuously as the train approached Gregg street, as required by section 1023 of the Houston city ordinance, but its whistle, although blown for the crossing and from a few blocks to perhaps a quarter of a mile to the east of it, was never sounded at all from the time the two men left the store until after the accident.

Special Issue No. 10, as submitted by the court to the jury, was this:

"Did the fireman upon such engine discover and realize the perilous and dangerous situation, if any of the occupants of said automobile, in such time that he could, in the exercise of ordinary care, have given warning to the engineer so that the engineer in the exercise of the same degree of care, by the use of the means at hand, consistent with the safety of himself, the engine, the train, and the persons thereon could have stopped or slackened the speed of the train, or given warning of the approach of the train so as to have avoided killing the deceased? Answer 'Yes' or 'No' as you find the fact to be."

To this question the jury answered "Yes."

If credence be given to this evidence, it cannot be that the automobile was moving "slowly" toward the railway track, and the fireman did not discover and realize that its occupants would probably go upon it until they had practically done so   To make such an assumption is to disregard entirely the reiterated testimony of the engineer that the car was going 12 or 15 miles per hour, and that his engine was then 75 feet away; the fireman himself, also, dum tacet clamat to the contrary, in his quoted statement to the engineer that he saw the two men 'coming toward the track when they were about 30 feet from it, and knew from the way they were coming, the speed, that they were going to get on the track and be struck." It rather presents a case of the occupants of the automobile approaching the railroad track, oblivious of the proximity of the train, all in plain view of the onlooking fireman, who does nothing whatever to warn the engineer until it is so late that the automobile crosses over the railway track within 6 inches of being in the clear when the fatal collision takes place; a case where the travelers were in the direct view of the fireman while their car, with its unbroken speed convincing him that they would not stop, and his engine were traveling many feet, possibly several hundred, if the speed be put near the maximum shown in the testimony, before he gave the belated warning the engineer acknowledged; this, too, where the controls of the engine were in perfect working order, and an appreciable slackening of its speed or a warning blast from its whistle could have been made in less than one second. If the doctrine of discovered peril has been so whittled away in Texas as not to apply to a condition of that kind, then, indeed, would it be necessary to make out a case of murder or criminal negligence, as the court remarks in Higginbotham v. Railway, cited infra, in order to ever show a right of recovery under it.

From the fact that only the questions of discovered peril and contributory negligence are discussed, and the reversal ordered upon the jury's findings upon them alone, the inference is permissible that the majority of this court concluded that there was no other reversible error in the judgment of the trial court; at least that is the view of this member. The verdict as reduced by the remittitur could not, in the circumstances, it seems to me, be said to be excessive in amount, nor was the action of the lower court in overruling the motion for new trial shown to be such an abuse of discretion as called for a revision by this court.

As this is a mere dissent from the conclusions upon which the court reversed the judgment, it is not deemed essential that the other matters be further gone into. The divergence in view leading to the dissent may perhaps at once be illustrated by quoting these declarations from the majority opinion:

"Even if the fireman saw the deceased, in the present case, moving slowly towards the track as the train approached the crossing, he had the right to assume that deceased would stop at a place of safety and not go upon the track. He certainly was not required to an-

ticipate that deceased would be guilty of an act of negligence by putting himself in danger."

"In the present case, however, it is shown by the undisputed evidence that the fireman knew that the view of the occupants of the automobile was unobstructed, and that if they were looking and listening for the approaching train, as he had a right to assume they were, they would see and hear said train, and he had a right to assume, in the absence of some act other than that they were moving slowly toward the train, * * * that as reasonable human beings they would stop until the train had passed."

In support of these pronouncements, which are elsewhere in the body of the opinion in effect reiterated, are the following authorities quoted and relied upon: Pillow v. Ry. Co., 55 Tex. Civ. App. 597, 119 S. W. 128; Ry Co. v McMillan, 100 Tex. 562, 102 S. W. 103; Ry. Co. v. O'Donnell, 99 Tex. 636, 92 S. W. 409; Schaff v. Gooch (Tex. Civ. App.) 218 S. W. 783. In much respect, the opinion is here ventured that these cases do not rule the one at bar; they did not involve the situation here obtaining, in that every one of them had to do with a pedestrian, and he was walking on or near the railway track in circumstances where the train operatives either did not see the man at all or last saw him in a place of comparative safety, while here the deceased, with unslackened speed, was actually approaching in an automobile the railroad crossing on the street he was driving upon; that is, two automatically operated machines were running at right angles on intersecting highways directly toward each other, and at close proximity. The two situations cannot, therefore, in any just or legal sense, be said to be the same. While no attempt is here made to iron out any conflicts, if such there be, between these decisions and those elsewhere cited as supporting the view of the dissentient, this indication that they were controlled and determined by essentially different facts is pointed out:

In Schaff v. Gooch the pedestrian when last seen by the railroad company's employés was between the tracks and walking approximately parallel to them. 218 S. W. 792.

In Ry. Co. v. McMillan, 100 Tex. at top of page 564, 102 S. W. 103, the evidence shows that the employés did not know that the man was in danger until they were in 200 feet of him, when under the other facts appearing, it was too late to stop the train.

In Pillow v. Ry Co., 55 Tex. Civ App. 597, 119 S. W. 129, the fireman testified that he saw the man, whom he took to be the one who flagged the train, going along down by the side of the track on the embankment.

In H. & T. C. Ry Co. v. O'Donnell, 99 Tex. 636, 92 S. W. 409, the man was deaf, a fact unknown to the train operatives, and was, when last seen by them, walking along parallel with the train.

In Ry. Co. v. Shetter, 94 Tex. 198, 59 S. W. 533, the last time the employés saw the pedestrian, they saw him stop just before stepping upon the track.

Further cases referred to with approval by the majority are T. & P. Ry. Co. v. Breadow, 90 Tex. 30, 36 S. W. 410, and M., K. & T. Ry. Co. v. Malone, 102 Tex. 269, 115 S. W. 1158. In the Breadow Case, the last time the employés saw the pedestrian he was walking on the main track when the engine, which afterwards hit him, was on a passing track; in the Malone Case there was no evidence that the employés saw the injured person at all.

It is apparent, therefore, that the majority, in applying here a rule resulting from a wholly dissimilar situation, assumed the very fact at issue in this case—that is, that Wagner either actually did see or should in law be held to have seen the train, thereby both ignoring the jury's contrary findings and at the same time confusing with discovered peril the wholly separate question as to whether or not Wagner was himself contributorily negligent. The unsoundness of that assumption lies in the fact that under the undisputed evidence his potential or imminent danger was then on; he was at that very moment, with the admitted knowledge of the fireman, moving steadily toward the point of collision on the railroad track at the same speed the automobile had been maintaining since it left Orlando's store going northward. Wagner was not attempting suicide, and the law will not presume that he was; it presumes the contrary. Hovey v. Sanders (Tex. Civ. App.) 174 S. W. 1029. In addition, the jury's finding was that both he and Davis, the driver, actually exercised due care in every respect, and the evidence shows that both presumption and finding were amply justified.

The advantage was all on the side of the fireman, in that he then saw the automobile was moving toward the track, while Wagner did not see the train. It therefore must and will be assumed that had he later been warned of the near proximity of the train he would have done as any reasonable man under the circumstances, that is, stopped his automobile if he could. It is further clear from the record that he could have stopped it before reaching even the first track of the crossing, had a warning been given.

That the vice indicated inheres in the majority view throughout is further shown from their definition of discovered peril, to this effect:

"It means a discovery of one in a situation of actual danger or peril, from which it is made reasonably to appear to a person of ordinary intelligence that he either could not or would not extricate himself, or that he was in a situation such as would reasonably raise an apprehension in the mind of a person of ordinary intelligence, in the exercise of ordinary care, that he would place himself in peril."

If this means that the actual discovery of the engineman that a driver or pedestrian is approaching a point of collision with the en-

gine, the potential peril thus being actually discovered, does not raise the issue of discovered peril for the determination of a jury, because the engineman may assume that, if the driver or pedestrian uses ordinary care, he will not get hurt, it is not only contrary to Hines v. Arrant (Tex. Civ. App.) 225 S. W. 767 (writ of error refused by the Supreme Court, 240 S. W. xviii), but also appears to be in direct conflict with Wilson v. Southern Traction Co., 111 Tex. 361, 234 S. W. 664, where Judge Greenwood said:

"In the above language, we have the express declaration that a party would not be permitted, in a case of discovered peril, to base a defense on the plaintiff's concurrent negligence, though it was operative at the time of the injury as a proximate cause thereof."

Of like effect is Trochta v. Ry. Co. (Tex. Com. App.) 218 S. W. 1038.

So, as the engineman cannot excuse himself because the injured party was himself negligent, it does not appear to me that he could do so by assuming at a frightful risk that the other will yet use ordinary care when there is no overt indication that he will do so, and when further, as a matter of common knowledge—especially to experienced railroad operatives—many things, such as absent-mindedness, preoccupation with the management of the automobile, or distraction of attention from other causes, to say nothing of possible defects in eyesight, deafness, and the like, may, and daily do, cause men who are ordinarily reasonably prudent to drive automobiles upon a railroad track in front of an on-coming train. In such situation the law will not, in my view, permit the train operatives to wait until they know the person approaching the train is in unescapable peril; it will not suffer such delay; their duty is to act if they realize that the person approaching is "about to enter a perilous situation." H. & T. C. Ry. Co. v. Finn, 101 Tex. 511, 109 S. W. 918.

The idea is thus stated in Ry. Co. v. Dumas (Tex. Civ. App.) 149 S. W. 547:

"To discover that a party is about to enter upon the track under such conditions as that he will be run over by the train is as much a discovery of his peril as if he was at said time actually upon the track. The operatives of the train did, in law, have actual knowledge of the peril of the deceased when they saw those in the automobile approaching the track, and it reasonably appeared to them, if such was the fact, that the occupants of the automobile would not probably stop before they reached the track, and would not pass over the same in time to avoid collision with the train. The engineer testified that he saw the automobile approaching the track when he was at sufficient distance to have stopped his train in time to avoid a collision. Whether or not he saw it under such conditions as that he was justified in believing that it would stop before entering upon the track, or that it would pass over in time to avoid collision with the train, or the contrary,

were issues properly submitted to the jury under the evidence in this case."

In the language of some of the most notable opinions of this court itself on this question, speaking on the duty of trainmen in such circumstances through its present Chief Justice: "They cannot speculate upon whether or not there is actual peril. If the peril is only probable their duty arises." Higginbotham v. Ry. Co. (Tex. Civ. App.) 155 S. W. 1025.

It seems to me that the conclusion is inevitable that the fireman upon this engine, as with unlawful swiftness he sped down the railroad track with the automobile directly opposite him and in plain view approaching the crossing just as he was approaching it, could not have done other than realize the probable danger to Wagner.

The rule upon this subject, with the express approval of our Supreme Court, is thus stated in Hines v. Arrant (Tex. Civ. App.) 225 S. W. 770, in reference to the duty of the engineer:

"He could not in the very nature of things actually know what was in the mind of the appellee as the latter was driving toward the crossing. It was his duty, if he discovered the appellee approaching the crossing and could reasonably infer that he would likely undertake to cross the track, to use the facilities at hand to prevent a collision, either by stopping * * * or by giving some warning of the train's approach. He had no right to wait until he was absolutely certain that the traveler was going into a place of danger before taking the proper steps to avoid injuring him."

In Ry. Co. v. Ford (Tex. Civ. App.) 237 S. W. 655, the court's pronouncement is equally plain and unmistakable.

The same rule is even more aptly stated for this court by Judge Pleasants in the Higginbotham Case, as follows:

"If the doctrine of discovered peril only applied when the operatives of a train were certain that the person injured was in peril of life and took no steps to save him when his injury could have been prevented, the necessary proof in every case in which discovered peril is the ground of recovery would show a case of murder or criminal negligence. Such proof is not necessary. * * * The authorities, when rightly construed, are one on the proposition that, in order to give rise to this new duty resting upon the discovery of peril, it is not requisite that the engineer must know that disaster is inevitable unless he himself can avert it. It is enough if he knows that the person injured was in a place of danger from which he probably could not or would not extricate himself, in time."

In the case of Galveston Electric Co. v. Antonini (Tex. Civ. App.) 152 S. W. 845, the same learned judge happily puts the matter this way:

"That the motorman saw the boy approaching the crossing in time to have slackened the speed

of the car and prevented the collision is clear from the evidence. If the manner in which the boy was driving was such as to reasonably indicate that he intended to cross in front of the car, it was the motorman's duty to at once use proper care to prevent the collision. He had no right to take any chance on the boy's getting across before the car reached him, nor could he speculate on whether he would stop or turn aside before he reached the track; there being nothing in the boy's action to indicate any such intention. In such circumstances we think ordinary prudence required that the motorman should act on the reasonable appearance of danger or peril to the appellee, and not wait until the danger was manifest and the injury unavoidable."

The force of the principle these decisions exemplify, the rule of law they correctly announce, as well as its applicability here, is in no sense detracted from by the fact findings therein appearing to the effect that it was apparent to the train operatives that those approaching the railroad track would probably go upon it, for the reason that that very finding, on sufficient evidence, was made by the jury in this instance; this fireman from and throughout an admitted distance of 75 feet, and inferably from credible evidence more than twice that far, saw this automobile moving steadily toward the point of collision without slackening at all the speed it had been maintaining all the time, thereby admittedly indicating to him that it would go upon the track, and with no fact or circumstance of any sort even tending to indicate that its occupants either saw or heard the on-coming train; he knew the unlawfully rapid speed his engine was making, and as a rational human being further knew that a collision was inevitable unless one vehicle or the other stopped or turned aside; yet he "took the chance" the automobile would do this, and did nothing himself until it was too late. That his action, instead of being "within his right to so assume," as the majority hold, was a plain violation of the new or superadded duty his actual discovery laid upon him, seems clear to me, under the authorities just quoted from.

Nor is it any answer to these considerations to say there was no time to avert this disaster after the fireman made his discovery. As a matter demonstrable from the facts recited, as well as one of common sense, there was time. This engine had a whistle; it could be sounded instantly, and easily heard much further than the two converging machines were apart. The hearing of the occupants of the automobile was good; their car could either have been stopped within about 10 feet or have been accelerated from its moderate speed of from 4 to 15 miles an hour so as to have made 6 inches more—all that was required to clear the railroad track—before the engine reached it. Furthermore, while the train might possibly not

262 S.W.—58

have been entirely stopped short of the place of impact, no reason appears for concluding that, if the fireman, when at least 75 feet east of the crossing, had signaled the engineer on first seeing the approaching automobile, the latter could not have sufficiently slackened the speed of his train by releasing the sand upon the track under the wheels, or throwing on his brakes, to have permitted the automobile to make the one remaining half foot to safety.

To say the least of these matters, they were for the jury. The law says that "every legitimate conclusion from the facts favorable to the verdict" shall be indulged in inquiries of this kind. The jury were entitled to rely upon their common sense; they were entitled to believe as practical men that with the engine the admitted 75 feet from the crossing the death of Wagner could have been avoided either by a lessening of the speed of the train or a warning blast from the whistle. They did so believe, as their verdict reflects.

For the proper consideration of this feature it is necessary to entirely lay out of the case—as seems to me has not been done in this decision—the question as to whether or not there was any contributory negligence upon Wagner's part; even were it conceded that he was not only negligent, but foolhardy, that condition would not at all affect the question.

In cases where the injured person was admittedly negligent in his conduct it is sometimes difficult to keep that fact from having an adverse influence in the determination of the issue of discovered peril. But properly it can have no just bearing. The law will not permit even a very negligent person's being killed or injured if it can be avoided in the exercise of ordinary care by the use of any means at hand. The very negligence of the injured man always serves to place him in a helpless condition. He is to be viewed as in the midst of peril, a peril for which his own act is responsible. And then, so viewing him, the question becomes: Was it possible to have avoided his injury had those who occasioned it acted as would have ordinarily prudent men aware of the peril of a fellow-man, in the use of available means?

In the Houston Case (Fort Worth & Denver City Railway Co. v. Houston, 185 S. W. 919, by the Court of Civil Appeals for the Second District, the court held that with the plaintiff only 15 feet from the railway track when she changed her direction and started toward the track to cross it, and with the engine only 10 feet from her when she stepped upon the track, there still was time. This case was later decided by the Supreme Court on writ of error, but this holding of the Court of Civil Appeals was not disturbed. 111 Tex. 324, 234 S. W. 385.

Likewise, upon the issue of contributory

negligence, it seems to me the scales of evidence dip decidedly on the side of the jury's findings. It is a mistake to say that the evidence affecting this feature was the same upon the present trial as upon the former one in which this court reversed the trial court's judgment. A number of witnesses testified who had not before done so, for instance, D. A. Middleton, J. Stuart Boyles, J. W. O'Brien, C. M. Thompson, John T. Garrison, and R. L. Cole, photographs or plats of different features of the scene of the accident being for the first time introduced in connection with the testimony of several of them; others of them gave materially different and additional testimony to what they had before, among these appellant's claim agent, H. L. Davis, and its engineer on the train here involved, E. N. Williams. It is true the testimony of the two expert trainmen, Middleton and O'Brien, bore mainly upon the question of discovered peril, but it also sustained a distinct relation to that of contributory negligence.

· In addition to the facts recited in the preceding discussion, a short summary of others bearing upon this issue may be made as follows:

The deceased, Wagner, was a stranger in the city of Houston, having only been there 16 days before this accident. Neither he nor his companion, the witness Davis, who drove the automobile, beyond knowing that the railroad crossing was there, were familiar with the particular conditions then existing at the scene of it, and the crossing where it occurred was an exceptionally dangerous one, other accidents having occurred there. The railroad, running east and west across Gregg street, which ran north and south, had a north track for in-coming and a south track for out-going trains, each being 5 feet wide, with a 5-foot space between them; Wagner and Davis, going north from Orlando's store, had to cross this south track before reaching the north one. As has before been indicated, while the engineer swore otherwise, a number of the witnesses testified that within their hearing or knowledge no bell was rung continuously as the train approached the crossing, nor was the whistle blown near enough to it for that to have been done during the progress of the automobile from the store to the point of collision. No special warning therefore, was given Wagner and Davis at the time or after they left Orlando's store going northward toward the railroad. Section 1023; City Ordinance of Houston, required the engine bell to be rung continuously while the cars were in motion, and section 1022 prohibited the running of the train within the city limits (as this crossing was) at a greater rate of speed than 6 miles per hour; whatever the actual speed of the train at the time, it was undisputedly and knowingly being operated in violation of this law of the city at more than twice the prescribed rate, and by reasonable conclusion from the testimony already reviewed its speed was probably several times that fast.

G. O. Davis, the driver, testified:

"As I approached the track I looked up and down the track to see if there was a train coming. I did not see any and did not hear any. I always thought my hearing was good. I do not remember anything after it struck me. My first recollection after the accident was when they were sewing up my head and knee in the hospital. I was on the left-hand side of the Ford when the train struck me—the left-hand side going north. I was on the side furthest away from the train. Mr. Wagner was sitting on my right-hand side. I was driving the Ford. I looked for a train before I got there. I did not hear anything at all before the train struck me. I suppose, to the best of my knowledge, it must have been about 10 or 15 feet from the track, or something like that, when I looked to see if the train was coming. I could not say that I knew it was a double track there. I didn't know the train went along there frequently. I didn't know how frequently it went there. The reason I didn't see the train coming there were some little houses or *something of the kind* that broke my sight. My reason for not seeing it was *it was something that broke the sight that kept me from seeing it.*"

The italics are my own, indicating the positive testimony of Davis that he looked and that something did in fact obstruct his vision. Stratton and White both swore that at the time of this accident there were several houses on the east side of Gregg street between Orlando's store and the railroad right down close to the track, and the former also said there was a big barn there too.

One of the photographs in evidence, taken in connection with a prior accident to this one, shows two detached freight cars on the south railroad track close to the scene of this one. Appellant's freight yards were located just east of this crossing, and many trains and cars habitually moved backwards and forwards over it. Pipe lines were being laid for it about a block and a half east of where this collision occurred at that precise time. Wagner was sitting to the right of Davis, between him and the approaching train. There was a line of large telegraph poles with heavy rows of yardarms at the top on the right of way close to the south track, and extending eastward along the railway line as far as the eye could see; also one large pole on the east side of Gregg street and another just to the east of that, both on the south side of the first railroad track and within the line of the right of way. There was further, at a point 120 feet east of the center of Gregg street, a cattle guard extending south from this first track, and built onto it was one panel of a high board fence; then just to the west of this fence, and consequently also directly athwart the line of

vision toward the train of Wagner and Davis when close to the railway track, was a high plank sign standing apparently several feet up over the top of the panel of the fence. The photographs in evidence featuring these actual physical conditions at the time alone convince me that the jury were well within the proper exercise of their prerogative in accepting Davis' statement that something obscured his vision when he looked for the train.

But if it could be said that these physical conditions were not shown to have been calculated to break one's vision from the point where Davis said he looked, it was still within the jury's province to reconcile them with his testimony, if that could be reasonably done; in other words, they might have believed that he looked but was mistaken as to his distance then from the track, and that he was not so near the railroad as he thought he was; there is no evidence of his being familiar with detailed conditions at the crossing; he testified without contradiction that he didn't even know there were two tracks there, and so was only giving his estimate from recollection of the general situation at the time he looked, made years after the occurrence.

But, be that as it may, under all these attending conditions and circumstances referred to, it seems to me the jury might very reasonably have concluded that some one of them did interfere with his sight at the particular time he looked, being presumably preoccupied to some extent at least with the operation of his own machine, and probably also looking ahead into one of the most dangerous railroad crossings in the city of Houston for the safety of his own movements at the same time.

While there was some confusion in the law touching the question of contributory negligence in crossing accidents such as this at the time of this court's former opinion in this cause, it is now well settled that one is not guilty of contributory negligence in approaching and driving across a railroad track in front of an on-coming train merely because he could have discovered the train in time to have prevented the collision, but failed to do so; that even his failure in fact to look or listen does not of itself constitute negligence as a matter of law, but that the question is still one for the jury, under all of the circumstances attending; Harrell et ux. v. Ry. Co. (Tex. Com. App.) 222 S. W. 221; Texas & N. O. Ry. Co. v. Harrington (Tex. Com. App.) 235 S. W. 188; Trochta v. Ry. Co. (Tex. Com. App.) 218 S. W. 1038. See, also, Boyd v. Ry. Co., 101 Tex. 411, 108 S. W. 814; Ry. Co. v. Fuller, 13 Tex. Civ. App. 151, 36 S. W. 319.

If, therefore, the jury has the right to say that, considering all the facts and circumstances in the case, a total failure to either look or listen or to do any other specific act in the effort to discover whether or not a train is approaching is not negligence, it follows that it may also say that a failure to look or listen at some particular point is not negligence. But if, notwithstanding what has been pointed out, it could be said that Wagner and Davis here were guilty of contributory negligence in going upon the railway track in the way they did, there would still remain as a fact issue for the jury the question of whether such negligence was the proximate cause of the injury, since the railway company was also negligent. T. & N. O. Ry. Co. v. Harrington (Tex. Com. App.) 235 S. W. at page 192. That issue, too, on undoubtedly sufficient evidence, was determined adversely to appellant. Furthermore, in approaching this crossing, located as it was in a populous district inside the limits of the city, these men were not required to anticipate that appellant would negligently rush its train across the public streets in open violation of its statutory duty both to confine its speed to 6 miles per hour and to ring its bell all the while. Ry. Co. v. Holland, 27 Tex. Civ. App. 397, 66 S. W. 68, 70; Davis v. Pettitt (Tex. Civ. App.) 242 S. W. 786; Ry. Co. v. Gray, 65 Tex. 36; T. & N. O. Ry. Co. v. Diaz (Tex. Civ. App.) 234 S. W. 925. And the evidence is undisputed that, had the train been running only the lawful 6 miles per hour, it could have been stopped short of the point of collision after the fireman saw from its speed and position that the automobile was going onto the track; how, then, can it still be said that the excessive speed of the train was not conclusively shown to have been the proximate cause of the accident?

A painstaking review of the record has convinced me that the case was fairly tried under a proper charge, and that the evidence sustained the jury's verdict; it should therefore be permitted to stand. I respectfully but earnestly dissent from the judgment of reversal.

### On Rehearing.

PLEASANTS, C. J. The opinion of the majority of this court reversing and remanding this cause, written by Justice LANE, is so full and fair in its statement of the evidence, so clear and logical in its conclusions, and so well sustained by the authorities, many of which are cited in the opinion, that it would not be necessary to add anything further in support of the judgment of reversal but for the surprising and erroneous conclusions of fact contained in the dissenting opinion of Justice GRAVES. While the sincerity of these conclusions is not questioned, it is pertinent to remark that a talent for fluent writing and a taste and capacity for rhetorical expression are not usually conducive to accuracy or clearness in judicial ut-

terances, but, on the contrary, unless vigilantly guarded and controlled, ofttimes, by presenting a multiplicity of immaterial issues, obscure the real issue and mislead the reader. The truth of this observation is clearly illustrated by the dissenting opinion. The only phase of the issue of discovered peril submitted to the jury was whether the fireman on the engine which collided with the automobile in which the deceased was riding was negligent in not sooner warning the engineer of the peril of the occupants of the automobile. The majority of the court were and are of opinion that the uncontradicted evidence shows that the fireman did warn the engineer as soon as he discovered the peril of the deceased, and that up to the time he gave this warning the deceased was not in peril, and there was nothing in the situation to reasonably indicate to the fireman that he would place himself in a perilous position. Justice GRAVES held to the opinion that the facts that the fireman saw the automobile approaching the crossing when it was 50 feet or more distant from the track, and that the speed of the car was not slackened at any time after the fireman saw it, were sufficient, regardless of the speed of the car, to give notice to the fireman that the automobile would probably go upon the track in front of the approaching train, and required him, in the exercise of ordinary care, to at once warn the engineer, and this was the point of disagreement as understood by the majority of the court. This being the only issue of discovered peril passed upon or presented to the jury, this court, in determining the question of whether the evidence was sufficient to sustain the judgment, was not authorized to consider the evidence tending to show that the engineer was negligent in failing to slacken the train or give additional warning of its approach after he had been warned of the peril of the occupants of the automobile.

The only issue of discovered peril submitted to the jury, or requested by the plaintiff to be submitted, is found in special issue No. 10, which reads as follows:

"Did the fireman upon such engine discover and realize the perilous and dangerous situation, if any, of the occupants of said automobile, in such time that he could in the exercise of ordinary care, have given warning to the engineer so that the engineer in the exercise of the same degree of care, by the use of the means at hand, consistent with the safety of himself, the engine, the train, and the persons thereon, could have stopped or slackened the speed of the train, or given warning of the approach of the train so as to have avoided killing the deceased? Answer Yes or No as you find the fact to be."

To this question the jury answered "Yes."

Under no possible construction of this charge can it be said that the issue of negli-

gence on the part of the engineer was submitted to the jury, and the answer of the jury to this question, if it can be construed as a finding of negligence, can only be applied to the fireman. It goes without saying that the answer of the jury to the question propounded, if sustained by sufficient evidence, would not by itself support a judgment against the defendant, but, under the rule which authorizes appellate courts to assume that the trial court found additional facts necessary to support the judgment when there is evidence in the record sufficient to sustain such finding, we would probably have to assume upon the evidence in this record that the court found that the negligence of the fireman was the proximate cause of the collision, although that issue was not submitted to the jury. Recent decisions of our Supreme Court, however, have clearly modified this rule to the extent of denying to trial courts the power to find in favor of either party upon an alleged ground of recovery or defense not submitted or requested to be submitted to the jury.

In the case of Texas City Transportation Co. v. Winters (Tex. Com. App.) 222 S. W. 541, this is said:

"The power of the trial court to substitute its findings, where none have been made by the jury, does not admit of a finding by the court upon an independent ground of recovery which the party alleging it does not urge. In such case the issues submitted will be treated as embracing the only grounds upon which recovery can be had; and the failure of plaintiff to tender an issue not submitted by the court will be treated as a waiver or abandonment thereof."

This rule is reiterated and applied by the Supreme Court in the case of Ry. Co. v. Price (Tex. Com. App.) 240 S. W. 528, and again stated and applied by the same court in the cases of Boatner v. Ins. Co. (Tex. Com. App.) 241 S. W. 136, and Kistler v. Latham (Tex. Com. App.) 255 S. W. 984.

Chief Justice Fly, speaking for the Court of Civil Appeals for the Fourth District with his usual vigor and clearness, had thus stated the rule before the Supreme Court's decisions above cited were rendered. In the case of San Antonio Public Service Co. v. Tracy (Tex. Civ. App.) 221 S. W. 638, he says:

"If a plaintiff can allege separate acts of negligence, acquiesce in the submission of only one of them to a jury, and then sustain the verdict on a ground of negligence upon which the jury did not pass, but which it is presumed was found by the judge, jury trial would become a farce, and the ultimate decision on facts as to other grounds of negligence would rest with the judge. Article 1985 of the Revised Statutes is not elastic enough to stretch to that extent. It simply means that, where a jury has passed on certain issues as to a certain case submitted to them if there be evidence as to other

necessary matters connected with the issues found by the jury, it will be deemed that the court found on such matters in order to support the judgment."

A similar statement of the rule was made by the Court of Civil Appeals for the Fifth District in the case of Texas Drug Co. v. Cadwell, 237 S. W. 976.

[6] This being the law of the case, it follows that the evidence and argument contained in the dissenting opinion upon the question of the negligence vel non of the engineer in failing to exercise proper care to avoid the injury after he was warned by the fireman of the peril of the deceased are entirely beside the question upon which the case was necessarily decided by this court. Whether the evidence raised the issue of negligence on the part of the engineer might properly be considered in determining whether judgment should be rendered by this court or the cause remanded for a new trial, but, as the majority of the court decided, though with grave doubts of the soundness of the conclusion, that the issue of contributory negligence was in the case and should not be held concluded against the appellees, as a matter of law, and remanded the cause for a new trial, it was not deemed necessary to consider or discuss the question of whether the evidence upon the issue of discovered peril raised the issue of negligence on the part of the engineer in the respect above stated. If required to pass on that question the majority would agree with the dissenting justice that the evidence does raise the issue. This in no way conflicts with our holding that the evidence does not raise the issue of discovered peril based on the negligence of the fireman as found by the jury. The evidence upon this issue is brief, and in the opinion of the majority can sustain but one conclusion, and that is that the fireman gave the warning as soon as he discovered the peril of the deceased, and that there was nothing in the acts of the occupants of the automobile, or the speed at which it was approaching the crossing, from which the fireman could have anticipated sooner than he did that the occupants of the car would probably attempt to cross the track in front of the approaching train. The fireman is dead, but we have his version of the occurrence from his statement to the engineer, which was testified to by the latter without objection. The engineer testified:

"When the fireman said 'Look out!' this man was on the south side of the main line coming toward the track, and he told me afterwards that from the way he was coming—the speed— that 'I knew he was going to get on the track and be struck,' * * * The man was about 30 feet from the track then; that is what the fireman told me afterwards; and following that I saw the man when he come on the track and got in the position I have just described. That is what I have described to you and that is exactly the way it happened. * * * I had not seen the automobile at that time, I am positive that the first time I saw the automobile was when the rear wheels of the automobile were on the north rail."

Only two witnesses testified as to the speed at which the automobile approached the crossing, both of whom testified for the plaintiffs. As stated in the dissenting opinion, Blake Stratton, who was about one-half block north of the railroad crossing and saw the automobile approaching from the opposite side of the track, testified that it started toward the track (from Orlando's store) slowly, but that he did not keep his eye on it and did not see it again until it had been struck by the train. Davis, the driver of the automobile, testified:

"It is my best judgment that we were not exceeding four or five miles an hour from the time we left Orlando's store until we got struck. We run along at the same speed practically all of the time. * * * Before either of us looked we were within 15 feet of the track."

Davis further testified that at the rate of speed at which he was going as he approached the crossing he could have stopped the automobile within 6 or 8 feet.

The engineer testified that when he saw the automobile on the track just at the time it was struck he judged it to be going 12 or 15 miles an hour. This statement of the engineer as to his estimate of the speed of the automobile after it got on the track and its occupants realized the nearness of the oncoming train does not tend to contradict the statement of the driver of the car as to its speed before it reached the point at which the fireman gave the warning.

From this testimony, which is all there is in the record tending to show the speed and manner in which the automobile approached the crossing, it is gravely contended in the dissenting opinion that the jury were justified in finding that the fireman should reasonably have anticipated, before the car reached the point 30 feet from the track, at which time the undisputed evidence shows the warning was given, that the occupants of the car would probably drive upon the track in front of the approaching train, the view of which was unobstructed. In the mind of the writer the question does not admit of argument, and is definitely settled against the minority contention, not only by the authorities cited in the opinion of Justice LANE, but by every authority of which the writer is aware.

It is a non sequitur to argue, as the dissenting opinion does, that the fireman should be held guilty of negligence in not anticipating that the automobile would probably go upon the track because the deceased, Wagner,

did not see the approaching train. How the dissenting justice discovered that Wagner did not see the train is not disclosed; but one thing is certain from all the evidence, that if he did not see it it was because he did not look in the direction from which it was approaching, and certainly the fireman cannot be charged with knowledge of the fact, if it be a fact, that neither the deceased nor the driver of the automobile saw the train when they were bound to have seen it if they had cast their eyes in that direction.

The minority opinion finds no support in any of the cases which it cites. This is especially true of the cases of Galveston Electric Co. v. Antonini (Tex. Civ. App.) 152 S. W. 845, and Higginbotham v. Ry. Co. (Tex. Civ. App.) 155 S. W. 1025. It was not the intention of the writer of those opinions, nor of any member of the court for whom he spoke, to in any way change or question the doctrine announced in the cases cited in Justice LANE'S opinion, which hold that discovered peril means exactly what these words imply, and that before the duty which that situation invokes arises the person charged with the duty must see and realize the peril. Peril may exist in a given situation although injury may not be inevitable therefrom, but it cannot be said to exist until injury becomes reasonably probable. This is the substance of the holding in the cases mentioned. In the Antonini Case the testimony of the motorman disclosed that when he saw the boy approaching the crossing he was standing up in his wagon driving directly towards the crossing and whipping his horse to urge him on faster, thus giving every indication of his intention to cross the track in front of the approaching car. In the Higginbotham Case the deceased was on the track, not looking toward the on-coming train, intent upon an effort to get his horses, that had gone upon the track and were either loath to get off or had become entangled thereon with a rope, out of the way of the train. In these circumstances it was held that the operatives of the train, seeing Higginbotham's position and his purpose in remaining on the track, should have realized that he would probably not get off in time to avoid injury. The quotations from the opinions in those cases set out in the minority opinion show that in each of them the situation of the injured person was such as to make it reasonably probable that injury would result unless the operatives of the train or car used proper care to prevent it. The evidence in this case presents no such situation, and the issue of liability of the appellant on the ground of discovered peril, based on the alleged negligence of the fireman, is not raised by the evidence.

While not insensible to the eloquence of those paragraphs of the dissenting opinion dealing with the sanctity of human life and the inconsequence of property rights as compared therewith, and extolling the lofty doctrines and maxims of the law which show its solicitude for the protection of the person, it is not perceived that this appeal is appropriate in the discussion of the questions involved in this case, nor entitled to any weight in the judicial determination of these questions.

Upon the question of contributory negligence the dissenting opinion is, if possible, further away from the law and the facts in the case. I am inclined to agree with the dissenting justice that the holding of the majority of the court upon this issue was erroneous, but the error in the holding was not in reversing the judgment on this issue, but in failing to hold that upon the undisputed evidence the occupants of the automobile should be held guilty of contributory negligence as a matter of law.

The record will be searched in vain for a word of testimony, other than the statements of the driver, Davis, that the reason he did not see the train coming was that "some little house or something of the kind" broke his sight, which tends to show that the train was not in the unobstructed view of the occupants of the automobile from the time they reached a point 75 feet from the railroad track. The dissenting opinion states that "this fireman from and throughout an admitted distance of 75 feet, and inferably from credible evidence more than twice that far, saw this automobile moving steadily toward the point of collision." This statement is fully sustained by all of the testimony, and it cannot be true that the fireman on the engine could see the automobile during all the time it was traveling the 75 feet and yet the occupants of the automobile could not have seen the train if they had looked in that direction. The law of physics forbids such conclusion, and annihilates any such contention. All of the maps and photographs put in evidence show that after the automobile got within 75 feet of the track the view of the train was unobstructed, and that "the little house or something" alluded to by Davis was not there. Wagner and the driver, Davis, had crossed the railroad track at this crossing, going from the north side of the railroad on their way to Orlando's store, about 20 minutes before the collision, which occurred on their way from the store back to the north side of the railroad, and the statement in the dissenting opinion that neither Wagner nor Davis "were familiar with the particular conditions then existing at the scene" is unwarranted and misleading. The evidence failed to disclose any particular condition existing at the crossing. There was nothing in the surroundings to make the crossing especially dangerous, except that it was on a frequently traveled street of the city, and railroad trains were frequently run over the crossing. The existence of the

tracks across the street charged Davis and Wagner with notice that a train might be expected thereon at any time, and they cannot be relieved of the duty of using ordinary care to discover the approach of the train by the plea that they did not know it was a specially dangerous crossing.

The attempt made in the dissenting opinion to relieve the occupants of the car of contributory negligence because of the failure of the operatives of the train to give the warnings of the approach of the train by blowing the whistle and ringing the bell as required by the statute is another abortion. The failure to ring the bell and blow the whistle as required by the statute were alleged in the petition as grounds of negligence, but the evidence was so against the truth of these allegations that plaintiffs did not request that either of these grounds of recovery be submitted to the jury, and they were not submitted. Under the decisions cited and quoted from in the first portion of this opinion, the plaintiffs having failed to request the submission of these issues, they must be considered waived. Notwithstanding this settled rule of law and the fact that all of the positive testimony on the issues shows that the signals were given as required by the statute, the minority opinion states that the weight of the evidence is in favor of the plaintiffs on these issues.

It is useless to discuss the question further. Justice GRAVES has changed his opinion on the issue of contributory negligence presented in this case since the former appeal of the case. He says in his dissenting opinion that the evidence in this record on this issue is not the same as on the former appeal. His opinion does not set out any evidence on this issue that was not before the court on the former appeal, and I have been unable to find any evidence in this record on the issue of contributory negligence which adds a feather's weight to the evidence on that issue which was before the court on the former appeal. But, be this as it may, the learned justice not only had the right to change his opinion, but it was his bounden duty so to do, since he has reached the conclusion that his former opinion was wrong.

His reference to the state of the authorities upon the question of contributory negligence in going upon a railroad crossing without looking or listening for an approaching train is incomplete. One of the latest expressions of our Supreme Court upon the question of contributory negligence on the part of one who goes upon a railroad track without looking or listening for an approaching train is found in Ry. Co. v. Price (Tex. Com. App.) 240 S. W. 526, before cited. The opinion in that case was written by Justice McClendon, of the Commission of Appeals, and approved by the Supreme Court. The following quotation from the opinion shows that

our Supreme Court has not adopted the view that there can be no contributory negligence as a matter of law in failing to look and listen before going upon a public railroad crossing. Many of the cases cited in this opinion are public crossing cases. The opinion thus states and answers the question:

"The specific question here presented is whether one who in the possession of his faculties steps immediately in front of a moving train, the approach of which is unobstructed from his view, and which could be seen and heard by him by the use of his ordinary faculties or by taking any precautions whatsoever, is guilty of contributory negligence as a matter of law when he fails to use his ordinary faculties and as a result thereof is injured. There are several cases by our Supreme Court in which this precise question has been adjudicated, in each of which the answer was in the affirmative. Railway v. Bracken, 59 Tex. 71; Railway v. Kutac, 72 Tex. 647, 11 S. W. 127; Railway v. Dean, 76 Tex. 73, 13 S. W. 45; Sanches v. Railway, 88 Tex. 117, 30 S. W. 431; Railway v. Edwards, 100 Tex. 22, 93 S. W. 106; Dennett v. Railway, 36 Tex. Civ. App. 459, 82 S. W. 33; Railway v. Kauffman, 46 Tex. Civ. App. 72, 101 S. W. 817. Writs of error were refused in the last two cases. The basis of this rule is embraced in the following quotation from Railway v. Gaddis (Tex. Com. App.) 208 S. W. 895: 'All men in possession of their faculties are charged with knowledge that a railroad track is a dangerous place, and the law will not permit them to go upon the track, even at a public highway, without being charged with a recognition of the danger attending such action and the use of such care as ordinary prudence would dictate in so doing. Where no care whatever has been exercised, our courts uniformly held that contributory negligence exists as a matter of law, and recovery is denied. What acts of prudence as constituting ordinary care are required is usually a question of fact.'"

The writer, as before stated, is inclined to the view that this case comes within the rule announced in the case just cited, but in any event the verdict of the jury upon the issue of contributory negligence is so clearly wrong that the majority of this court, in the performance of what they conceived to be their duty, felt constrained to set it aside. That this power and duty, which once belonged to the Supreme Court, is now placed upon the Courts of Civil Appeals, is established by an unbroken line of authorities. It may be that such power should not be given an appellate court, but so long as the law remains as it now is the power carries its corresponding duty and responsibility which cannot be evaded.

The statement in the dissenting opinion, taken largely from the appellees' motion for rehearing, in regard to two errorless trials and the verdict of 24 jurors, does not appeal to the writer, as it apparently does to the dissenting justice, as a conducive or very forceful argument against the opinion of the

majority. It is not true that the trial in the court below was errorless. As indicated in the original opinion, the trial court erred in refusing to submit special issues requested by the defendant. These requested special issues were as follows:

"Issue No. 2. Did the occupants of the automobile, or either of them, before they reached the track, and at such distance from the track that they could have stopped the automobile before reaching the track, stop, look, or listen for the approaching train?

"Issue No. 3. Did either of the occupants of the automobile look for the approaching train at such distance from the track that they could have stopped their automobile before reaching the track, and thus have prevented the accident?

"Issue No. 5. Was the noise made by the running of the train as it approached the crossing sufficient to warn a party in such close proximity to the track of the approach of the train so that he could have stopped his automobile before he reached the crossing, if he had used ordinary care to listen for the approach of the train?"

Each of these special issues presented one or more of the group of facts relied on by the defendant to establish the plea of contributory negligence.

The issue of contributory negligence was submitted by the court as follows:

"Issue No. 4 was: Did either of the occupants of the automobile fail to use ordinary care to look for the approaching train before or at the time of going upon the railroad track?"

Issue No. 6 was:

"Did either of the occupants of the automobile fail to use ordinary care to listen for the approaching train before and at the time of going upon the railroad track?"

Issue No. 8 was:

"Were either of the occupants of the automobile guilty of negligence in not stopping the automobile and in going upon the railroad track at the time and under the circumstances they did?"

These issues are in general terms, and we think the defendant had the right to have the jury pass directly upon the specific issues of fact presented by the evidence, and relied on by the defendant to establish contributory negligence. We understand this to be the rule announced by the Supreme Court in the case of Fox v. Hotel Co., 111 Tex. 461, 240 S. W. 517.

The refusal of a trial court to submit issues in this way would not always require a reversal of the judgment. The harmfulness of an error of procedure depends largely upon the state of the evidence, and where the verdict is apparently against the great weight of the evidence, as it clearly is in this case, any error in giving or refusing charges should be regarded as harmful.

We have discussed the dissenting opinion rather than the motion for rehearing because the one is based upon the other. We have fully considered the motion, which is earnest and vigorous, but feel constrained, for the reasons before expressed, to adhere to our original opinion.

The motion is overruled.

GRAVES, J. (dissenting on rehearing). The appellees' motion for rehearing is to me so convincing of the correctness of the original dissent that another must be entered on the order overruling it. As the minority view was before very fully stated, perhaps more so than necessary, only brief comment will here be added, merely to help further clarify the lines of difference that have developed.

It was never my idea that, as concerns the issue of discovered peril, more than one element of recoverable negligence, that of the fireman, was involved; on the contrary, the court's charge on the subject so limiting that phase of the cause of action was formerly quoted in full. But I cannot agree that on that account all consideration of the engineer's status must needs be immaterial. It seems to me self-evident from the form of this issue, as so framed by the trial court, that the situation of the engineer in the circumstances was necessarily involved as incidental to and in part determinative of the ultimate question of whether or not the fireman was, under that doctrine, negligent; in other words, the relation of the engineer to the emergency and whether or not he could, "in the exercise of ordinary care" upon his part, when notified by the fireman, have either stopped or so checked or given warning of the approach of the train as to have prevented the accident, was expressly made by the court an ingredient of the sole inquiry submitted to the jury, the gist of which simply was: Did the fireman discover Wagner's peril in time, by the exercise of ordinary care by each trainman in his turn for the injury to have been avoided? This may not have been the clearest way to submit the question—indeed, under the evidence, we all now seem agreed that the quality of the engineer's acts might also have been independently asked about—but since it was done that way the fireman's default could not have constituted actionable negligence against appellant unless there was still time and means unavailed of to avert its consequences through the engineer, while acting "in the exercise of ordinary care." This, by all the authorities, is the law of discovered peril. Ry. Co. v. Broadow, 90 Tex. 30, 31, 26 S. W. 410.

The purpose, therefore, in going into the evidence affecting the engineer was to demonstrate, not whether he did or did not in fact do what he should have, but that his

opportunities and means at hand were such that he could have prevented the collision, thus supplying an essential element in the fireman's negligence. That must likewise have been the theory 'underlying the trial below, else this evidence would not have been in the record. To argue for the application to this situation of the rule quoted from such cases as Texas City Trans. Co. v. Winters (Tex. Com. App.) 222 S. W. 541, and San Antonio Pub. Service Co. v. Tracy (Tex. Civ. App.) 221 S. W. 638, is plainly but to set up a man of straw.

With all due deference, I confess myself unable to determine just what the majority conclusion upon discovered peril is, there appearing to be no community of view between them about it. Judge LANE on original submission expressly held that such issue as to the fireman was in the case, but that the jury's finding upon it was "so against the great weight and preponderance of the evidence that it should not be permitted to stand," thereby sustaining appellants' alternative contention to that effect only (original opinion, page 4 [262 S. W. 902]), and of course remanding the cause for another trial on that issue too. On rehearing, however, the Chief Justice holds just the other way, as follows:

"If required to pass on that question [referring to discovered peril as applicable to the engineer's acts], the majority would agree with the dissenting justice that the evidence does raise the issue. This in no way conflicts with our holding that the evidence does not raise the issue of discovered peril based on the negligence of the fireman as found by the jury. The evidence upon this issue is brief, and in the opinion of the majority can sustain but one conclusion, and that is that the fireman gave the warning as soon as he discovered the peril of the deceased, and that there was nothing in the acts of the occupants of the automobile, or the speed at which it was approaching the crossing, from which the fireman could have anticipated sooner than he did that the occupants of the car would probably attempt to cross the track in front of the approaching train."

Be that as it may, however, I agree with the Chief Justice that under the evidence on both grounds of recovery submitted, it is more logical from the majority standpoint to hold that no issue of discovered peril was raised at all, and that Wagner was guilty of contributory negligence as a matter of law, than to fall back upon the narrow twilight zone between the condition where the evidence is sufficient to raise an issue for the jury and yet insufficient to permit a verdict to stand upon it. There is such a legal domain, but it is often in shadow, and rarely very clear. To solemnly so declare under the undisputed state of this evidence seems to me but to beg the question at issue between the members of this court, and the Chief Justice's rejoinder well-nigh admits that it does.

If my former conclusions of fact were erroneous in any particular, and certainly neither the fluency nor rhetoric in the expression of them necessarily makes them so, it has not been so demonstrated on rehearing. The correctness of not a single quotation from the statement of facts has been challenged. On the contrary, much of the same testimony is reiterated, and different conclusions are then drawn from it; that is all. It accordingly would be profitless to again go into the evidence.

Sincere consideration for the opinion of my associates, however, has led to a re-examination of the record in this respect, with the result that I am unable to change the findings first made. While I still think the preponderance even of the evidence on both litigated issues supported the jury's findings upon them, it is of course unnecessary to go that far in maintaining the legal position taken, merely that there was at least enough evidence on each issue to take both to the jury so strongly supported that this court may not disturb findings thereon. If the states of fact controlling the cases cited and relied on in Judge LANE'S majority opinion are in legal effect not different from those obtaining here (as I think they clearly are), then it seems to me there indubitably are two parallel lines of authorities in Texas applying substantially different tests to the conduct of railway operatives in the same circumstances, and until the Supreme Court chooses between them I prefer, as more consonant with reason and recent judicial trend, the one before quoted from Hines v. Arrant (Tex. Civ. App.) 225 S. W. 770:

"He [the engineer] could not in the very nature of things actually know what was in the mind of the appellee as the latter was driving toward the crossing. It was his duty, if he discovered the appellee approaching the crossing and could reasonably infer that he would likely undertake to cross the track, to use the facilities at hand to prevent a collision, either by stopping * * * or by giving some warning of the train's approach. He had no right to wait until he was absolutely certain that the traveler was going into a place of danger before taking the proper steps to avoid injuring him."

Writ of error was refused by the Supreme Court.

I think the equivalent of the facts which made that expression the law in that case is equally present in this. If the Higginbotham and Antonini Cases do not embody the same doctrine, then the saying of Talleyrand, "The purpose of language is to conceal thought," may explain the difference.

My associates think this fireman had a right to assume that Wagner would stop, and to run him down—or, more softly, to

cast the legal consequences upon him—if he did not. I think he had no such right, but was in duty bound to "reasonably infer that he would likely undertake to cross the track." This precise question has been recently certified by this court to the Supreme Court in the case of H. E. & W. T. Ry. Co. v. John Kopinitsch (No. 8403) 264 S. W. ——. They further think that Davis, the driver, could not be believed when he directly testified that he did look for the train before going on the track, and that something did in fact interfere with his line of vision. I think they are unconsciously trenching upon the jury's province in this, and should permit their finding upon it to stand.

The view that the laws of physics forbid the conclusion that the fireman could see them and yet the occupants of the automobile could not see the train must really rest upon the discovery of a new law in that exact science, as none of the hitherto known ones are pointed out as having been infracted. The same theory of the Chief Justice, under a like conclusion of fact as to a mutually unobstructed view between an automobile and a train approaching each other, led this court into the wilderness in the recent case of La. Western Ry. Co. v. Jones (Tex. Civ. App.) 233 S. W. 363, but on writ of error the Supreme Court reversed this court's judgment and affirmed that of the trial court, holding in necessary effect that no such violated law of physics existed, and that the question as to Jones' contributory negligence was one for the jury. Jones v. La. Western Ry. Co. (Tex. Com. App.) 243 S. W. 976. Surely, then, it is permissible to decline being taken a second time to Waterloo. Especially so here, because in this instance no mere presumption of ordinary precaution for his own safety on this deceased's part (Jones v. Ry., supra, par. 4, at page 979) had to be depended upon, in view of the driver's direct testimony that it was taken, and, further, because the jury on this trial found—in response, doubtless, to the evidence on this feature cited in the former dissenting opinion—that there was an obstruction of Wagner's view, and that within 50 feet of the track, in answering affirmatively this question propounded by the court at appellant's request:

"Was there anything to prevent or obstruct the view of the occupants of the automobile or either of them from seeing or hearing the train as it approached the crossing, 'before they reached the crossing and within a distance of 50 feet of the track?"

So there was no basis for the new law of physics to operate upon, and, in its absence, I cannot see how this court, with nothing but a written record to aid it, is in equal position with the jury and trial court to pass upon such a fact issue. It was easily possible, it seems to me—and the jury evidently thought the same thing—for some one of the telegraph poles, the panel of fence, the high board sign, or even the bulk of his companion's body between him and it, to have interfered with the driver's vision at the particular time he looked for the train, just as it was held a singletree might have done in Ry. Co. v. Myrick (Tex. Civ. App.) 208 S. W. at page 937, there being positive evidence otherwise that he did look.

The necessity here for defending the power of the Courts of Civil Appeals to reverse jury verdicts where they are so against the overwhelming weight of the evidence as to be clearly wrong is not perceived. It has not been attacked, the only point at issue being whether any such preponderating weight against it existed. Comment in my former opinion upon the evidence as demonstrating that no special warning was given the occupants of the automobile as they neared the railroad track at least as concerns the blowing of the whistle seems to me to have been justified by these special issues submitted to and the appended findings made thereon by the jury:

"Special issue No. 2. Were the operatives of the engine in question guilty of negligence in failing to give any additional warnings or signals by whistle of the approach of their engine to Gregg street than were given? Yes.

"Special issue No. 2. * * * Did the negligence, if any you have found, of the operatives of the engine in question in failing to give or cause to be given any additional warnings or signals by whistle as the engine approached Gregg street, proximately cause the death of the deceased? Yes."

Only two further. observations will be made. The statement in the last majority opinion that "Justice GRAVES has changed his opinion on the issue of contributory negligence presented in this case since the former appeal," while admittedly adverting to a wholly immaterial consideration, is at the same time both inaccurate and inept. After being mentioned at all, it would have been a much happier reference to say: "The case has changed on the issue of contributory negligence between the two trials, and, as wise men do with the times, Justice GRAVES has changed with it." The report of the issues on the first trial, appearing in this court's opinion (224 S. W. 377), shows this. That conflicting opinions of the higher courts upon the question of contributory negligence involved were also then extant is demonstrated by a reference to the cases of Ry. Co. v. Harrell (Tex. Civ. App.) 194 S. W. 971; Ry. Co. v. Harrington (Tex. Civ. App.) 209 S. W. 685 (subsequently overturned by the Supreme Court, 235 S. W. 188), and to those cited by the Chief Justice in this connection. Ry. Co. v. Price (Tex. Com. App.) 240 S. W. 526, from which he quotes, had not at that

time been decided. The point has never been that the Price Case does not reflect the true rule, but merely that confusion in fact existed at the former time. That the evidence on the two trials was different was sufficiently indicated before, and, as we cannot agree as to what it was, or its effect, it becomes useless to further advert to it.

The concluding holding on rehearing that the trial court erred in not submitting special issues 2, 3, and 5, requested by appellant, belated as it seems, is a new feature, but I do not think it sound. In view of the determinative questions as raised by the pleadings and evidence as a whole, it seems to me these inquiries went only to evidentiary details, and not to ultimate and controlling issues of fact; if that be their effect, it is not my understanding that the case of Fox v. Hotel Co., 111 Tex. 461, 240 S. W. 517, cited in this connection, overturns the long-established rule that it is not error for the trial court to refuse the submission of evidentiary matter only. In like manner as before, I dissent.